<span style="color:red">**JS-6 ADMIN**</span>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **LACV 23-03033 JGB (MRW)** | Date | July 14, 2023 |
| Title | ***Pedro Murillo et al. v. Target Corporation et al.*** | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| TANISHA CARRILLO | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**    **Order (1) DENYING Plaintiffs' Motion to Remand (Dkt. No. 21); (2) GRANTING Defendant's Motion to Stay (Dkt. No. 23); and (3) VACATING the July 17, 2023 Hearing (IN CHAMBERS)**

Before the Court are two matters: (1) a motion to remand filed by Plaintiffs Pedro Murillo and Isaac Garcia ("Plaintiffs") ("Motion to Remand," Dkt. No. 21); and (2) a motion to stay filed by Defendant Target Corporation ("Target" or "Defendant"). ("Motion to Stay," Dkt. No. 23.) The Court finds the matters appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motions, the Court **DENIES** the Motion to Remand and **GRANTS** the Motion to Stay. The Court **VACATES** the July 17, 2023 hearing on the Motions.

## I. BACKGROUND

On January 31, 2023, Plaintiffs filed a putative class action complaint against Target and Does 1-10 in the Superior Court of the State of California for the County of Los Angeles. ("Notice of Removal," Dkt. No. 1.) On April 21, 2023, Target removed the action pursuant to the Class Action Fairness Act ("CAFA"). (Id.) In support of the Notice of Removal, Defendants filed declarations of Michael Brewer ("Brewer Declaration," Dkt. No. 3), Paul F. White ("White Declaration," Dkt. No. 4) and Anna M. Skaggs ("Skaggs Declaration," Dkt. No. 5.) Plaintiffs' complaint alleges six causes of action: (1) failure to pay minimum and straight time wages in violation of Cal. Lab. Code §§ 204, 1194, 1194.2 and 1197; (2) failure to pay overtime wages in violation of Cal. Lab. Code §§ 1194 and 1198; (3) failure to timely pay final wages at termination in violation of Cal. Lab. Code §§ 201-203; (4) failure to provide accurate itemized

wage statements in violation of Cal. Lab. Code § 226; (5) failure to indemnify employees for expenditures in violation of Cal. Lab. Code § 2802; and (6) unfair business practices in violation of Cal. Bus. & Prof. Code §§ 17200 et seq. ("Complaint," Dkt. No. 1, Ex. A.) On April 28, 2023, Defendant filed an answer to the Complaint. ("Answer," Dkt. No. 15.)

On May 19, 2023, Plaintiffs filed the Motion to Remand. (Motion to Remand.) In support of the Motion to Remand, Plaintiffs filed a declaration of John Yslas ("Yslas Declaration," Dkt. No. 21-1) and evidentiary objections to the Brewer Declaration, White Declaration, and Skaggs Declaration. ("Plaintiffs' Initial Remand Evidentiary Objections," Dkt. No. 21-2.)

On May 26, 2023, Defendant filed the Motion to Stay. (Motion to Stay.) The same day, Target filed a memorandum in support of the Motion to Stay. ("Stay Memorandum," Dkt. No. 24.)[1] Defendant also filed a declaration of Jeffrey D. Wohl ("Wohl Declaration," Dkt. No. 25-1) along with five exhibits in support of the Motion to Stay. (See "Stay Exs. A-E," Dkt. Nos. 25-1-5.)

On June 5, 2023, Defendant filed an opposition to the Motion to Remand. ("Remand Opposition," Dkt. No. 26.) In support of the Remand Opposition, Defendant filed (supplemental) declarations of Paul F. White ("White Supplemental Declaration," Dkt. No. 27), Anna M. Skaggs ("Skaggs Supplemental Declaration," Dkt. No. 28) and Leeann Schellenberg ("Schellenberg Declaration," Dkt. No. 29.) The same day, Defendant also filed a response to Plaintiffs' Initial Remand Evidentiary Objections. ("Response to Plaintiffs' Initial Remand Evidentiary Objections," Dkt. No. 30.)

On June 5, 2023, Plaintiffs filed an opposition to Defendant's Motion to Stay. ("Stay Opposition," Dkt. No. 31.) In support of the Stay Opposition, Plaintiffs filed evidentiary objections to the Wohl Declaration. ("Plaintiffs' Stay Evidentiary Objections," Dkt. No. 31.)

On June 12, 2023, Defendant replied in support of the Motion to Stay. ("Reply ISO Motion to Stay," Dkt. No. 32.) In support of the Reply ISO Motion to Stay, Defendant filed a second supplemental declaration of Anna M. Skaggs ("Skaggs Second Supplemental Declaration," Dkt. No. 33) and two exhibits. (See "Reply ISO Motion to Stay Exs. A-B," Dkt. Nos. 33-1-2.) The same day, Defendant filed a response to Plaintiffs' Stay Evidentiary Objections. ("Response to Plaintiffs' Stay Evidentiary Objections," Dkt. No. 34.)

On June 12, 2023, Plaintiff replied in support of the Motion to Remand. ("Reply ISO Motion to Remand," Dkt. No. 35.) In support of the Reply ISO Motion to Remand, Plaintiffs filed evidentiary objections to the (supplemental) declarations Defendant filed in support of the Remand Opposition. ("Plaintiffs' Subsequent Remand Evidentiary Objections," Dkt. No. 35-1.)

---

[1] All references hereinafter to the page numbers of Defendant's briefing in support of the Motion to Stay are to the Stay Memorandum.

**CIVIL MINUTES—GENERAL**

Also in support of the Reply ISO Motion to Remand, Plaintiff filed a request for judicial notice, along with eight exhibits.  ("RJN," Dkt. No. 36.)[2]

On June 20, 2023, Defendant filed a response to Plaintiffs' Subsequent Remand Evidentiary Objections.  ("Response to Plaintiffs' Subsequent Remand Evidentiary Objections," Dkt. No. 37.)[3]

## II.   FACTUAL ALLEGATIONS

Plaintiffs allege the following facts in the Complaint relevant to disposition of the Motions:

Plaintiffs bring all six of their causes of action on behalf of themselves and a putative class defined as: "All persons who worked for [Target] in California as an hourly-paid or non-exempt employee at any time during the period beginning four years and 178 days before the filing of the initial complaint in this action and ending when notice to the Class is sent."  (Complaint ¶¶ 1, 2, 24.)  "Defendant maintained a systematic, company-wide pattern and practice of":

> (a)  Failing to pay employees for all hours worked, including all minimum, straight time, and overtime in compliance with the California Labor Code and IWC Wage Orders;
> (b)  Willfully failing to pay employees all minimum, straight time, and overtime due within the time period specified by California law when employment terminates;
> (c)  Failing to provide employees with accurate, itemized wage statements containing all the information required by the California Labor Code and IWC Wage Orders; and
> (d)  Failing to indemnify employees for expenditures incurred in direct discharge of duties of employment.

(Id. ¶ 4.)  Defendant was on actual and constructive notice of these violations "and intentionally refused to rectify its unlawful policies."  Defendant's violations "during all relevant times herein were willful and deliberate."  (Id. ¶ 5.)

---

[2] The RJN consists of complaints from other class actions and orders from other courts ruling on motions to remand in those cases.  (See RJN.)  The Court does not rely on the complaints in resolving the Motions and it need not take judicial notice of the orders of other courts to consider them; Plaintiffs cite to the reported decisions in their briefing.  The RJN is DENIED AS MOOT.

[3] The Court has carefully considered Plaintiffs' Initial Remand Evidentiary Objections, Plaintiffs' Stay Evidentiary Objections, and Plaintiffs' Subsequent Remand Evidentiary Objections.  Any evidence relied upon in this order the Court finds admissible; Plaintiffs' objections to that evidence are OVERRULED.  Plaintiffs' objections to any evidence not relied upon in this order are DENIED AS MOOT.

Plaintiff Pedro Murillo is a resident of Los Angeles, CA who worked for Defendant in Los Angeles County as an hourly paid, non-exempt employee from approximately November 2016 to approximately November 2022. (Id. ¶ 7.) Plaintiff Isaac Garcia is a resident of San Lorenzo, CA who worked for Defendant in Alameda County from approximately August 2022 to approximately October 2022. (Id. ¶ 8.) Defendant typically scheduled both Plaintiffs to work at least five days in a workweek and at least eight hours per day, but both also worked more than eight hours in a workday and more than 40 hours in a workweek. (See id. ¶¶ 14-15.) Plaintiffs' "experience working for Defendant was typical and illustrative." (Id. ¶ 16.)

"Throughout the statutory period, Defendant maintained a pattern and practice of not paying Plaintiffs and the Class for all hours worked, including minimum, straight time, and overtime wages. Defendant would routinely manufacture time keeping records to falsely show that Plaintiffs and the Class did not work prior to clocking-in when in fact they worked 'off-the-clock,' uncompensated including, but not limited to, receiving, reviewing and replying to emails and text messages when off the clock. The effect is that Defendant frequently paid Plaintiffs and the Class less than all their work time. Much of this unpaid work should have been paid at the overtime rate. In failing to pay for all hours worked, Defendant also failed to maintain accurate records of the hours Plaintiffs and the Class worked." (Id. ¶ 17.)

"Throughout the statutory period, Defendant willfully failed and refused to timely pay Plaintiffs and the Class all final wages due at their termination of employment. In addition, Plaintiffs' final paychecks did not include payment for all expenditures, minimum wages, straight time wages, and overtime wages, owed to them by Defendant at the conclusion of their employment. . . . Defendant's failure to timely pay Plaintiffs' final wages when their employment terminated was not a single, isolated incident, but was instead consistent with Defendant's pattern and practice that applied to Plaintiffs and the Class." (Id. ¶ 18.)

"Throughout the statutory period, Defendant has wrongfully required Plaintiffs and the Class to pay expenses that they incurred in direct discharge of their duties for Defendant. Plaintiffs and the Class regularly paid out-of-pocket for necessary employment-related expenses, including, without limitation, personal cell phone expenses (including when on duty) and work uniforms." (Id. ¶ 20.) "Plaintiffs and the Class incurred substantial expenses as a direct result of performing their job duties for Defendant, but Defendant failed to indemnify Plaintiffs and the Class for these employment-related expenses." (Id. ¶ 21.)

"California Labor Code § 204 requires employers to provide employees with all wages due and payable twice a month. Throughout the statute of limitations period applicable to this cause of action, Plaintiffs and the Class were entitled to be paid twice a month at rates required by law, including minimum and straight time wages. However, during all such times, Defendant systematically failed and refused to pay Plaintiffs and the Class all such wages due and failed to pay those wages twice a month." (Id. ¶ 39.)

"The Class is entitled to recover from Defendant their additionally accruing wages

for each day they were not paid, at their regular hourly rate of pay, up to thirty (30) days maximum pursuant to California Labor Code § 203." (Id. ¶ 55.) "Plaintiffs and the Class are entitled to recover from Defendant the greater of their actual damages caused by Defendant's failure to comply with California Labor Code § 226(a), or an aggregate penalty not exceeding four thousand dollars ($4,000) per employee." (Id. ¶ 63.)

## III.   LEGAL STANDARD

### A.  Motion to Remand

"CAFA gives federal district courts original jurisdiction over class actions in which the class members number at least 100, at least one plaintiff is diverse in citizenship from any defendant, and the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs." Ibarra v. Manheim Investments, Inc., 775 F.3d 1193, 1195 (9th Cir. 2015). "In determining the amount in controversy, courts first look to the complaint. Generally, the sum claimed by the plaintiff controls if the claim is apparently made in good faith." Id. at 1197 (quotations omitted).  "Whether damages are unstated in a complaint, or, in the defendant's view are understated, the defendant seeking removal bears the burden to show by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million when federal jurisdiction is challenged."  Id.

A defendant is required to file a notice of removal that includes only "a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." Dart Cherokee Basin Operating Co. v. Owens, 135 S. Ct. 547, 554 (2014).  However, if a plaintiff contests these allegations, "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied."  Id.  The preponderance of the evidence standard requires that "the defendant must provide evidence establishing that it is more likely than not that the amount in controversy exceeds that amount."  Sanchez v. Monumental Life. Ins. Co., 102 F.3d 398, 404 (9th Cir. 1996) (internal quotations omitted).  The parties "may submit evidence outside the complaint, including affidavits or declarations, or other summary-judgment-type evidence relevant to the amount in controversy at the time of the removal."  Ibarra, 775 F.3d at 1197 (internal quotations and citation omitted).  "[A] defendant cannot establish removal jurisdiction by mere speculation and conjecture, with unreasonable assumptions."  Id.

"CAFA's requirements are to be tested by consideration of real evidence and the reality of what is at stake in the litigation, using reasonable assumptions underlying the defendant's theory of damages exposure."  Id. at 1198.  "As with other important areas of our law, evidence may be direct or circumstantial.  In either event, a damages assessment may require a chain of reasoning that includes assumptions.  When that is so, those assumptions cannot be pulled from thin air but need some reasonable ground underlying them."  Id. at 1199.  "Under the preponderance of the evidence standard, if the evidence submitted by both sides is balanced, in equipoise, the scales tip against federal-court jurisdiction."  Id.

Under certain circumstances, attorney's fees may also be included in the amount in controversy.  "[I]f the law entitles the plaintiff to future attorneys' fees if the action succeeds, then there is no question that future attorneys' fees are at stake in the litigation, and the defendant may attempt to prove that future attorneys' fees should be included in the amount in controversy." Fritsch v. Swift Transp. Co. of Ariz., 899 F.3d 785, 794 (9th Cir. 2018) (internal quotations, brackets, and citation omitted).  However, "a court's calculation of future attorneys' fees is limited by the applicable contractual or statutory requirements that allow fee-shifting in the first place." Id. at 796.

## B.  Motion to Stay

In general, "[w]hether or not to grant a stay is within the court's discretion[,] and it is appropriate when it serves the interests of judicial economy and efficiency." Rivers v. Walt Disney Co., 980 F. Supp. 1358, 1360 (C.D. Cal. 1997).  A court may stay proceedings as part of its inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254 (1936); see also Clinton v. Jones, 520 U.S. 681, 706 (1997) ("The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket.").  The inherent power to stay includes ordering a stay "pending resolution of independent proceedings which bear upon the case." Leyva v. Certified Grocers of Cal., Ltd., 593 F.2d 857, 863 (9th Cir. 1979).

Where a stay is considered pending the resolution of another action, the court need not find that two cases possess identical issues; a finding that the issues are substantially similar is sufficient to support a stay. See Landis, 299 U.S. at 254.  In deciding whether to grant a stay, a district court must weigh the competing interests that will be affected. CMAX, Inc. v. Hall, 300 F.2d 265, 268 (9th Cir. 1962); see also Lockyer v. Mirant Corp., 398 F.3d 1098, 1110 (9th Cir. 2005) (affirming and applying the framework set forth in CMAX).  The competing interests include (1) the damage that may result from granting a stay; (2) the hardship or inequity a party may suffer if required to proceed in the litigation; and (3) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." CMAX, 300 F.2d at 268.

## IV.  DISCUSSION

Because it affects its subject matter jurisdiction over this action, the Court first addresses the Motion to Remand.  The sole argument Plaintiffs raise in the Motion to Remand is that this Court lacks subject matter jurisdiction because Defendant does not demonstrate that the amount in controversy exceeds the $5,000,000 jurisdictional threshold under CAFA.  (See Motion to Remand at 1.)  The Court finds that Defendant has met its burden to demonstrate that the amount in controversy exceeds $5 million; as such, it DENIES the Motion to Remand.  Satisfied of its subject matter jurisdiction over the action, the Court turns to the Motion to Stay.  Defendant requests that the Court stay this action in its entirety pending resolution of a related wage and hour class action against it, Sherry Montgomery v. Target Corporation et al., Central

District of California Case No. 19-CV-4924-JGB-MRW ("Montgomery"). (See Motion to Stay at 1.) Because the competing interests at issue favor a stay, the Court GRANTS the Motion to Stay.

**A. Motion to Remand**

There are three primary reasons the Court DENIES the Motion to Remand. The first, and by far the most important, is that Plaintiffs are seeking to represent an enormous class of individuals: their proposed class consists of all hourly-paid or non-exempt employees of Target in California over at least a 4.5-year period. (See Complaint ¶ 24.) Because Target is one of the largest employers in California (and the nation), and California is the most populous state in the nation, Defendant's (undisputed) evidence establishes that over 245,809 individuals are included in that definition, assuming the time period corresponds to those employed by Target in California since January 31, 2019. (See White Supplemental Declaration ¶ 9.) By virtue of the sheer size of that putative class, it is not hard to see why this case places at least $5 million in controversy. The second is that Plaintiffs have brought six causes of action, and while their allegations are limited in some respects, a fair reading of the Complaint demonstrates that they believe some meaningful percentage of class members, certainly more than 1 or 2 percent of them, are entitled to recovery for each of those causes of action. As such, even though the Court can and must reject the most liberal reading of the Complaint supplied by Defendant, the most conservative reading of it still inescapably places $5 million in controversy. Third, recent Ninth Circuit precedent, Jauregui v. Roadrunner Transportation Servs., Inc., 28 F.4th 989 (9th Cir. 2022), clarifies that, where a defendant supplies evidence in support of its contentions at least as detailed as that provided by Target here, a district court generally cannot "zero out" the amount in controversy for a given claim because it finds the assumption the defendant has made on the basis of that evidence unreasonable; instead, it should pick a lower estimate, based on a more reasonable assumption. Once again, even if the Court picks the lowest possible estimates for each of Plaintiffs' causes of action within the range of "reasonableness," there is simply no way to make the math add up to less than $5 million.

Although Defendant faults Plaintiffs for not supplying evidence of its own in the Motion to Remand, it appears to concede the broader point that Plaintiffs make a factual attack on jurisdiction and that Target therefore bears the burden of proving the amount in controversy by a preponderance of the evidence. (See Opposition at 17.) "A facial attack accepts the truth of the defendant's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction." Harris v. KM Indus., Inc., 980 F.3d 694, 699 (9th Cir. 2020) (internal quotations and brackets omitted) (quoting Leite v. Crane Co., 749 F.3d 1117, 1121 (9th Cir. 2014)). A factual attack "contests the truth of the . . . allegations" themselves. Id. (citation omitted). "When a plaintiff mounts a factual attack, the burden is on the defendant to show, by a preponderance of the evidence, that the amount in controversy exceeds the $5 million jurisdictional threshold." Id. (quoting Ibarra, 775 F.3d at 1197). A factual attack "need only challenge the truth of the defendant's jurisdictional allegations by making a reasoned argument as to why any assumptions on which they are based are not supported by evidence." Harris, 980 F.3d at 700 (citing Ibarra, 775 F.3d at 1199 (finding that it is sufficient to "contest[ an] assumption" without "assert[ing] an

alternative [assumption] grounded in real evidence").  Although Plaintiffs do not introduce evidence outside the pleadings, a factual attack "need only challenge the truth of the defendant's jurisdictional allegations by making a reasoned argument as to why any assumptions on which they are based are not supported by evidence."  Harris, 980 F.3d at 700.  Since that is what Plaintiffs do here, they mount a factual attack, placing the burden on Defendant to prove the amount in controversy by a preponderance of the evidence.

Before turning to Defendant's estimates of the amount in controversy, the Court reviews the central principles set forth in Jauregui, 28 F.4th 989.  In Jauregui, the named plaintiff, Griselda Jauregui, brought a putative wage and hour class action on behalf of current and former California hourly workers employed by Roadrunner Transportation Services (Roadrunner).  Id. at 991.  Roadrunner argued that, based on the company's payroll data and Plaintiff's allegations, the amount in controversy was $14,780,377.06.  Id.  The district court independently evaluated Roadrunner's calculations for each of the seven alleged violations in the complaint, finding Roadrunner's analysis sufficient as two claims (overtime and meal and rest break claims).  Id. at 991-92.  "For the remaining five claims, the court found that Roadrunner erred in its calculation of the amount in controversy, mostly because of reliance on incorrect variables or assumptions.  Critical[ly], the district court assigned a $0 value for the amount in controversy for each of the five claims where it disagreed with Roadrunner's calculations.  As a result, the district court concluded that the amount in controversy was only $2.1 million—the total for the two claims in which the district court agreed with Roadrunner's calculations."  Id. at 992.  The Ninth Circuit reversed, citing "two primary errors": "putting a thumb on the scale against removal and assigning a $0 amount to most of the claims simply because the court disagreed with one or more of the assumptions underlying Roadrunner's amount in controversy estimates."  Id.  The Ninth Circuit reaffirmed that there is no antiremoval presumption in CAFA cases, and faulted the district court for analysis that suggested that "removal under CAFA should be met with a level of skepticism and resistance."  Id. at 993.  Second, and more importantly, "latent throughout the order was an inappropriate demand of certitude from Roadrunner over its assumptions used in calculating the amount in controversy.  The problem with that approach is that a CAFA defendant's amount in controversy assumptions in support of removal will always be just that: *assumptions*. At that stage of the litigation, the defendant is being asked to use the plaintiff's complaint—much of which it presumably disagrees with—to estimate an amount in controversy."  Id.  Jauregui specifically criticized the district court's reasoning with regard to waiting time penalties, also at issue in this case:

> As one example, the court rejected Roadrunner's assumption that each terminated employee would have been entitled to the maximum 30-day waiting time penalty because Roadrunner "provides no evidence" supporting that fact.  But it was not unreasonable for Roadrunner to assume that the vast majority (if not all) of the alleged violations over the four years at issue in this case would have happened more than 30 days before the suit was filed, which would entitle the employees to the 30-day penalty. The fact that a very small percentage of employees might possibly not

be entitled to the maximum penalty is not an appropriate reason to dismiss altogether Defendant's estimate for this claim.

Id. at 993-94.  More generally, the panel found it "unrealistic" to assign "$0 to five out of seven of Plaintiff's claims."  Id. at 994.  It acknowledged that "if a defendant provided no evidence or clearly inadequate evidence supporting its valuation for a claim, then it might be appropriate for a district court to assign that claim a $0 value."  Id.  But that was "not what happened," for

> Roadrunner offered substantial evidence and identified assumptions to support its valuation of each of the various claims in this case.  In analyzing each of the claims, the court disagreed with some of Roadrunner's assumptions, identifying other assumptions that it concluded were better.  In a circumstance like this, merely preferring an alternative assumption is not an appropriate basis to zero-out a claim; at most, it only justifies reducing the claim to the amount resulting from the alternative assumption.  The approach used by the district court turns the CAFA removal process into an unrealistic all-or-nothing exercise of guess-the-precise-assumption-the-court-will-pick—even where, as here, the defendant provided substantial evidence and analysis supporting its amount in controversy estimate.

Id. at 994.  As another example of the district court's errors, the panel disagreed with its assessment of the minimum wage claim.  Id.  Roadrunner calculated the amount in controversy for that claim by assuming that one hour of work a week went unpaid, multiplied that by the 63,431 workweeks in question and an average wage of $16.22, for a total of about $1 million; that amount was doubled according to statutorily imposed liquidated damages, and an additional $3.1 million in potential penalties was added, totaling to $5.2 million.  Id. at 994-95.  The district court accepted most of these assumptions, but disagreed with the $16.22 average wage, for California's minimum wage was as low as $10.50 during the time in question.  Id. at 995.  Because the district court faulted Defendant for a "gross over-calculation," it assigned a $0 value to the claim.  Id.  The panel held that "[a]ssigning a $0 value was improper.  Neither party, nor the district court, believed the amount in controversy for this claim to be anywhere near $0.  Even using the lowest hourly wage rate offered by the district court ($10.50), the amount in controversy for this claim alone would still come out to over $4.5 million."  Id.  The plaintiff defended the district court's decision to zero out certain claims, arguing that it need only "weigh the reasonableness of the removing party's assumptions, not supply further assumptions of its own."  Id. at 995-96 (quoting Harris, 980 F.3d at 701).  The panel concluded by explaining when it is appropriate to zero out a claim:

> [T]here is an important distinction between a court offering entirely new or different assumptions itself versus modifying one or more assumptions in the removing party's analysis.  Where a defendant's assumption is unreasonable on its face without

> comparison to a better alternative, a district court may be justified
> in simply rejecting that assumption and concluding that the
> defendant failed to meet its burden.  But often, as illustrated here,
> the reason a defendant's assumption is rejected is because a
> different, better assumption is identified.  Where that's the case,
> the district court should consider the claim under the better
> assumption—not just zero-out the claim.

Id. at 996.  In sum, a district court must find an assumption "unreasonable on its face" to zero out a defendant's estimated amount in controversy that relies on the assumption; where a defendant has simply chosen an inflated estimate that is less reasonable than a lower alternative, the court must choose the lower, more reasonable figure, not just zero out the claim.

With these principles in mind, the Court turns to Defendant's estimates, along with the Court's own lower, more reasonable figures.  In the Notice of Removal, Defendant asserted that at least $95 million was placed in controversy based on a mere subset of one of Plaintiffs' claims, for waiting-time penalties.  (See Notice of Removal ¶ 23(e).)  As is its right, Defendant has supplemented the record once Plaintiffs contested removal, supplying additional evidence and assumptions based on the totality of the claims at issue in the Complaint.  (See Remand Opposition.)  The Court briefly summarizes that evidence and assumptions for four alleged violations: waiting-time penalties, wage-statement penalties, unpaid wages, and unreimbursed expenses.

**Waiting-time Penalties:** Based on a review of its corporate records, Defendant establishes that 143,605 class members were terminated for the period January 31, 2020 through March 22, 2020.  (White Supplemental Declaration ¶ 10(a); Opposition at 13.)  Assuming that each individual would be entitled to the 30-day maximum for waiting-time penalties (an 100% violation rate), the exposure on that claim would be $437,887,633.  (White Supplemental Declaration ¶ 10(b); Opposition at 13.)  To reach that figure, a labor economist retained by Defendant, Dr. Paul F. White, reviewed and analyzed Target's data for the employees of its California retail stores concerning all those terminated during this period, or the "Separated Team Members."  (White Supplemental Declaration ¶ 7.)  Dr. White found that the average number of hours worked per day by the Separated Team Members during this period was 6.39.  (See id. ¶¶ 7, 10.)  He also calculated each Separated Team Member's hourly rate at the time of separation.  (See id.)  By assuming that each Separated Team Member was entitled to waiting-time penalties equal to 30 days of wages multiplied by the average number of hours worked per day (6.39) for 30 days, the total amount in controversy exceeds $437 million.  (See id. ¶ 10(b).)  Although he does not explicitly state what the average final hourly rate for these Separated Team Members is, the Court can deduce it: since 6.39 (hours worked per day) x 30 (days) x 143,605 (individuals) = $27,529,078.50, to reach the $437,887.633 figure, that final average hourly rate was approximately $15.90.  In the Opposition, Defendant observes that, assuming a violation rate of 1.2%, the amount in controversy would still be satisfied based on that claim alone, amounting to $5,254,651.60.  (See Opposition at 13.)  Other, even more conservative assumptions, still place a significant amount in controversy.  For instance, if the Court assumes that a mere 5 percent of

putative class members are entitled to waiting-time penalties and that that same group was terminated more than 30 days before the Complaint was filed, entitling them to the 30-day statutory maximum, and it rounds down the average final hourly rate to $15 per hour, that calculation (6.39 (hours worked per day) x 30 (days) x 143,605 (individuals) x .05 x 15 (dollars per hour) would amount to $20,646,808.90, or over four times the CAFA jurisdictional threshold on that claim alone.  As further noted below, it strains credulity that Plaintiffs would file a class action based on even *more* conservative estimates, e.g., a violation rate significantly less than 5 percent.

**Wage-Statement Penalties:** Employing substantially similar methodology, Dr. White evaluated the potential class of the 143,605 Separated Team Members for this same time period.  (See White Supplemental Declaration ¶ 11.)  Dr. White then took a random sample of 20% of this group, thus providing a 20% violation rate for his further calculations.  (See id.)  Based on that sample, he made two alternate assumptions.  Assuming that group of 20% experienced a wage-statement violation in every pay period, a $50 penalty for the first pay period and $100 for every subsequent pay period, and accounting for the $4,000 statutory maximum per individual, Defendant would face $33,638,750 in wage-statement penalties.  (See id.; Opposition at 13-15.)  In the alternative, Dr. White assumed that this group experienced just one wage-statement violation during the applicable period, entitling them to a $50 wage-statement penalty each, amounting to $5,206,905.  (See White Supplemental Declaration ¶ 11(b); Opposition at 15.)  Once again, the Court could apply even more conservative assumptions, such as a 5% violation rate and a $50 penalty each, and it would still amount to a sizeable figure: $1,301,726.25.

**Unpaid Wages:** Assuming just 50,000 putative class members were owed unpaid wages (or approximately 20 percent of the putative class of 245,809) amounting to $2 per week for just one year (well less than the limitations period), Defendant asserts that $5.2 million would be placed in controversy.  (See Opposition at 15-16.)  The Court could make an even more conservative estimate: assuming 5 percent of the putative class were owed $1 per week in unpaid wages for one year, or $52, that would amount to $639,103.40 in controversy (.05 x 50,000 x $52).

**Unreimbursed Expenses:** Assuming just 50,000 putative class members (or approximately 20 percent of the putative class) were owed just $10 per month in unreimbursed cell phone and uniform expenses for just one year (well less than the limitations period), Defendant asserts that $6 million would be placed in controversy by Plaintiffs' claim.  (See Opposition at 16.)  The Court could make a more conservative estimate: assuming 5 percent of the putative class were owed just $50 total in unreimbursed expenses, $614,522.50 would be placed in controversy by this claim.[4]

The above analysis should make it clear that the amount placed in controversy by the Complaint is somewhere north of $5 million, no matter how one tweaks Defendant's figures.  While Plaintiffs protest that all these estimates are simply "pulled from thin air," their argument

---

[4] The Court need not, and does not, reach Defendant's additional contentions further augmenting the amount in controversy, such as the potential inclusion of attorney's fees.

boils down to this: any possible assumption a defendant makes based on a complaint is necessarily wholly speculative and should be disregarded. But where a complaint does not allege that, say, "70 percent of class members" are entitled to a certain form of relief, which this Complaint does not and seemingly no wage and hour class action complaint ever does, a defendant *must* make some kind of numerical assumption to calculate the amount in controversy. A defendant can supply robust, even overwhelming and irrefutable, *evidence* in support of its estimates, by establishing the number of employees in the putative class, when their employees started with the company or were terminated, their average wages, and so forth. But at the end of the day, to arrive at a total dollar figure, it must make some kind of assumption about how many of them are entitled to a certain kind of relief. See Jauregui, 28 F.4th at 993 ("[A] CAFA defendant's amount in controversy assumptions in support of removal will always be just that: *assumptions*. At that stage of the litigation, the defendant is being asked to use the plaintiff's complaint—much of which it presumably disagrees with—to estimate an amount in controversy."). "As is inescapable at this early stage of the litigation, the removing party must be able to rely 'on a chain of reasoning that includes assumptions to satisfy its burden to prove by a preponderance of the evidence that the amount in controversy exceeds $5 million,' as long as the reasoning and underlying assumptions are reasonable." Id. (quoting LaCross v. Knight Transp. Inc., 775 F.3d 1200, 1201 (9th Cir. 2015). Even where it has disagreed with a defendant's estimates, this Court has also "reject[ed] the view that *any* assumed violation rate would be unreasonable, which Plaintiff[s] come[] at least close to suggesting." Higgins v. Am. Bottling Co., 2022 WL 13811816, at *9 (C.D. Cal. Oct. 21, 2022) (Bernal, J.). The Court frequently finds removing defendants' assumptions about the amount in controversy under CAFA far too aggressive, and some of Defendant's contentions fall into that category as well. But since Target must make some assumptions, the Court is required to accept reasonable ones. Construing those assumptions as far as they possibly can be stretched in Plaintiffs' favor, the amount in controversy is still at least $5 million.

As the Court alluded to above, the dispositive fact here is the sheer size of the putative class. The Court would be more than willing to consider an alternative argument from Plaintiffs that the putative class is not composed of hundreds of thousands of individuals; if that figure were disputed, the Court would weigh both sides of the argument and arrive at the most reasonable figure. But Plaintiffs do not once question Target's asserted class size, conceding the point. (See Motion to Remand; Reply ISO Motion to Remand.) The Court does not find any reason to question Target's class size figure, which is based on its corporate records, and since Plaintiffs do not question it either, the analysis begins there. Essentially, it also ends there, for if a few hundred thousand people allege they are merely each entitled to pocket change, or that a tiny fraction of them are entitled to a modest amount of money, this case is easily worth more than $5 million.

The Court need not evaluate Defendant's contentions in much depth to highlight why that it so, for the waiting time penalties claim alone is enough to confer jurisdiction. Plaintiffs urge the Court to reject even Target's more conservative estimates, for it "has proffered no evidence to support *any* violation rate." (Reply ISO Motion to Remand at 7.) This is the identical argument that Jauregui, 28 F.4th 989 compels the Court to reject:

> As one example, the court rejected Roadrunner's assumption that each terminated employee would have been entitled to the maximum 30-day waiting time penalty because Roadrunner "provides no evidence" supporting that fact. But it was not unreasonable for Roadrunner to assume that the vast majority (if not all) of the alleged violations over the four years at issue in this case would have happened more than 30 days before the suit was filed, which would entitle the employees to the 30-day penalty. The fact that a very small percentage of employees might possibly not be entitled to the maximum penalty is not an appropriate reason to dismiss altogether Defendant's estimate for this claim.

Id. at 993-94. Once the Court accepts Target's evidence of the class size, and even if it refuses to assume that "the vast majority (if not all) of the alleged violations . . . would have happened more than 30 days before the suit was filed," the Court could pick an extremely low violation rate of 5 percent and the amount in controversy from this claim would *still* be four times the $5 million threshold by itself.

The extensive case law cited by the parties, much of it from this Court, reveal why the limiting allegations in the Complaint do not reasonably support assumed violation rates of 100 percent. But all of it is beside the point: since Defendant must make some kind of assumption as to what percentage of the class Plaintiffs claim are entitled to certain kinds of relief, violation rates of 5 percent or even less would get Defendant over the $5 million threshold. And no matter how much Plaintiffs protest that the allegations in the Complaint should not be read to mean that *every* class member is entitled to significant damages figures for *every* claim, the Complaint still reads like a class action complaint—in other words, one that repeatedly stresses that Defendant's allegedly unlawful conduct predominated among the putative class. Plaintiffs allege that "Defendant maintained a systematic, company-wide pattern and practice of" failing to pay their employees for all hours worked, failing to pay minimum, straight time and overtime wages, failing to provide accurate wage statements, and failing to indemnify their employees for expenditures incurred. (Complaint ¶ 4.) These violations were "willful and deliberate" and "intentional." (Id. ¶ 5.) "Throughout the statutory period, Defendant maintained a pattern and practice of not paying Plaintiffs and the Class for all hours worked, including minimum, straight time, and overtime wages." (Id. ¶ 17.) Defendant "would routinely manufacture time keep records." (Id.) "Defendant frequently paid Plaintiffs and the Class less than all their work time. Much of this unpaid work should have been paid at the overtime rate." (Id.) "Defendant's failure to timely pay Plaintiffs' final wages when their employment terminated was not a single, isolated incident, but was instead consistent with Defendant's pattern and practice that applied to Plaintiffs and the Class." (Id. ¶ 18.) "Plaintiffs and the Class incurred *substantial* expenses as a direct result of performing their job duties for Defendant, but Defendant failed to indemnify Plaintiffs and the Class for these employment-related expenses." (Id. ¶ 21) (emphasis added). "Throughout the statute of limitations period . . . Defendant systematically failed and refused to pay Plaintiffs and the Class all such wages due and failed to pay those wages twice a month." (Id.

¶ 39.) Should these allegations of "systematic" "pattern and practice" violations be construed as an 100% violation rate for every claim? In the view of this Court, no, though others might disagree. But can a "systematic" "pattern" be reasonably read to mean that 5 percent of the putative class experienced violations for a given claim? Surely the answer is yes. But even if "systematic" really means that 1 or 2 percent of the class experienced violations (which almost certainly cannot be the case, because that figure virtually by definition would defeat any prospect of this case proceeding as a class action), this case is still worth more than $5 million because Target is such a large employer.

The bottom line is that there is no possible way to read Plaintiffs' Complaint as a *class action* complaint, to accept Defendant's undisputed evidence of how big this putative class is, to acknowledge that Defendant must make *some* assumptions about violation rates, and not to find that this case places $5 million in controversy. Under any reasonable reading of the Complaint, and even under any *unreasonable* reading of the Complaint in Plaintiffs' favor, Defendant's chain of reasoning or the alternatives described above invariably compel this conclusion. Because Defendant has met its burden to establish by a preponderance of the evidence that more than $5 million is in controversy, the Court DENIES the Motion to Remand.

## C. Motion to Stay

Defendant requests that the court stay the instant action pending resolution of Montgomery, a putative class action asserting substantially similar claims against Target over which this Court is also presiding. (See Motion to Stay at 1.) On June 6, 2019, Plaintiffs Sherry Montgomery and Yesenia Alba filed the Montgomery action against Defendant, asserting seven wage-and-hour claims against Target. See Montgomery, "Complaint," Dkt. No. 1. On August 19, 2019, the Montgomery plaintiffs filed a first amended complaint, which remains the operative complaint. See id., "First Amended Complaint," Dkt. No. 29. The First Amended Complaint in Montgomery asserts eight causes of action for (1) failure to provide meal periods; (2) failure to provide rest periods; (3) failure to pay hourly wages; (4) failure to indemnify; (5) failure to provide accurate written wage statements; (6) failure to pay all final wages timely; (7) unfair and unlawful business practices under the UCL; and (8) violations of the California Labor Code, for which the plaintiffs seek civil penalties under the Labor Code Private Attorneys General Act ("PAGA"), Cal. Lab. Code § 2698 et seq. See id. The Montgomery plaintiffs bring their claims on behalf of themselves and a putative "Hourly Employee Class" consisting of "[a]ll persons employed by [Target] in hourly or non-exemption positions in California" beginning four years prior to the filing of the action, or June 6, 2015. (See id. ¶ 12.) On September 20, 2019, this Court stayed Montgomery pending resolution of overlapping claims asserted in Aisha Bowen v. Target Corporation et al., Central District of California Case No. 16-CV-2587-JGB-MRW ("Bowen"). See Montgomery v. Target Corp., 2019 WL 8168064 (C.D. Cal. Sept. 20, 2019). In weighing the factors relevant to consideration of a stay, the Court found that the issues in Montgomery and Bowen "overlap significantly," wherein "six of seven causes of action are the same," "the factual basis for the overlapping claims is also substantially similar," and though there were some differences between the two cases," the "two cases present issues that are, though not identical, substantially similar." Id. at *5. Because Bowen would likely have resolved

"most of the legal and factual questions" at issue in <u>Montgomery</u>, "it would [have been] inefficient to allow" <u>Montgomery</u> to proceed, for the "filing of duplicative actions hinders the resolution of cases and unnecessarily taxes the Court's resources." <u>Id.</u>  In November 2022, the Ninth Circuit issued an order that resolved any remaining issues of class certification against the <u>Bowen</u> plaintiffs, leaving only the plaintiffs' individual and PAGA claims; on that basis, this Court exercised its discretion to lift the stay in <u>Montgomery</u> on December 1, 2022.  (<u>See</u> <u>Montgomery</u>, "Order Lifting Stay," Dkt. No. 72.)  As the parties report, proceedings in <u>Montgomery</u> have advanced significantly over the past six months; they are currently engaged in discovery, with depositions for the named plaintiffs anticipated in the coming weeks.  (<u>See</u> Motion to Stay at 3-4) (summarizing developments in <u>Montgomery</u>).  In the Motion to Stay, Defendant argues, in sum, that the putative class and the claims they bring in the instant action are entirely subsumed by <u>Montgomery</u>, that Plaintiffs will not suffer prejudice if the Court stays this case, Target will suffer hardship if forced to litigate overlapping putative class actions simultaneously, and staying the instant action will promote judicial economy because all of Plaintiffs' claims are already being litigated in <u>Montgomery</u>.  (<u>See</u> Motion to Stay.)

The Court agrees with Defendant that a stay is warranted, for much the same reasons the Court stayed <u>Montgomery</u> pending resolution of <u>Bowen</u> (before subsequently lifting that stay). The Court assesses whether a stay would be warranted under the framework set forth in <u>CMAX</u>, 300 F.2d 265.  The first factor is "the damage that may result from granting a stay."  <u>Id.</u> at 268. Second, the Court considers "the hardship or inequity a party may suffer if required to proceed in the litigation."  <u>Id.</u>  Third, the Court weighs "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay."  <u>Id.</u>

Plaintiffs claim they would be prejudiced by a stay in four ways: (1) a stay would "deprive them of their opportunity to challenge this Court's jurisdiction"; (2) a stay would deprive them of the opportunity to pursue their state law claims in a state law forum; (3) a stay would deprive them "of an opportunity to timely take discovery regarding their individual claims, as well as their class claims"; and (4) a stay would "force them to subordinate their interests to the interests of different plaintiffs whom the Court has not yet adjudicated as adequate class representatives."  (<u>See</u> Stay Opposition at 4.)  None of these arguments are persuasive.  The first two are irrelevant: Plaintiffs were *not* deprived of an opportunity to challenge this Court's subject matter jurisdiction, for the Court gave them their chance and denied the Motion to Remand; because Defendant was entitled to remove this action, necessitating denial of the Motion to Remand, Plaintiffs never had the right to "pursue their state law claims in a state law forum."  As to the potential harm to Plaintiffs in delaying resolution of their claims, "the case's procedural posture weighs against a finding of prejudice.  The case is in the early stages: no trial date has been set and no discovery has commenced."  <u>Bitzer v. Ocwen Fin. Corp.</u>, 2018 WL 6164775, at *2 (C.D. Cal. Mar. 14, 2018).  While the resolution of Plaintiffs' individual claims may be delayed by a stay, their decision to bring their case as a putative class action necessarily subordinates some of their individual interests to that of the broader group of Target employees who they seek to represent.  As noted in more detail below, it is hardly surprising or unfair that their case will have to wait in line for an earlier-filed class action brought by a substantially similar putative class

asserting substantially similar claims.  Likewise, Plaintiffs would not suffer undue prejudice by the delay in resolution of their class claims or by the fact that other named plaintiffs may end up representing a class of Target employees.  One of two things will happen in <u>Montgomery</u>, and neither pathway will cause undue prejudice to Plaintiffs: If the Court certifies a class in <u>Montgomery</u>, its Rule 23 analysis will necessarily find that action is appropriate for class-wide resolution and that the named plaintiffs will be adequate and typical representatives of the class, of which Plaintiffs are members.  Plaintiffs raise no argument that their interests conflict with those of the putative class in <u>Montgomery</u>, so if <u>Montgomery</u> warrants class treatment, Plaintiffs' interests will be protected.  If the Court declines to certify a class in <u>Montgomery</u>, just as it did in <u>Montgomery</u> once the <u>Bowen</u> case did not proceed on a class basis, it will very likely lift the stay in the instant action, assuming Plaintiffs make that request.  The bottom line is this: if <u>Montgomery</u> ends up being the primary vehicle for bringing wage-and-hour claims against Target on behalf of the numerous individuals it employed in California over the previous eight years or so, Plaintiffs' interests will be adequately served by class-wide resolution there.  If <u>Montgomery</u> does not work out for the putative class, Plaintiffs would likely be next in line, and they will have their chance to succeed where their predecessors failed—perhaps even learning a thing or two from the litigants who moved before them.  Because the prejudice to Plaintiffs would be minimal, this factor weighs in favor of a stay.

Next, Target would suffer some prejudice if forced to litigate two overlapping class actions, expending additional time and money on duplicative discovery processes and motions practice.  Defendant's considerable resources mitigate some of this prejudice, while duplicative resource expenditure is not a particularly salient consequence given that it is somewhat inevitable in litigation.  This factor favors a stay as well, albeit only slightly.

In <u>Montgomery</u>, the third factor, "whether a stay will advance the 'orderly course of justice' by simplifying issues, proof, or questions of law,'" <u>Montgomery</u>, 2019 WL 8168064, at *5, was by far the most important consideration warranting a stay.  <u>See id.</u>  The same is true here, for largely the same reasons.  The Court has carefully reviewed the similarities and differences between the two cases, and it is obvious that the former eclipse the latter by a considerable margin.  Defendant provides a useful side-by-side comparison of the two, which the Court borrows here:

| *Claims Brought in Instant Action* | **Corresponding Claims in <u>Montgomery</u>** |
|---|---|
| Failure to pay minimum and straight-time wages under California Labor Code sections 204, 1194, 1194.2, and 1197, based on alleged off-the-clock work.  (<u>See</u> Complaint ¶¶ 17, 31-40.) | Failure to pay hourly and overtime wages under California Labor Code sections 204, 223, 510, 1194, 1194.2, 1197, 1197.1, and 1198, based on alleged off-the-clock work.  (<u>See</u> First Amended Complaint ¶¶ 22-28, 67-86.) |
| Failure to pay overtime wages under California Labor Code sections 510, 1194 and 1198, based on alleged off-the-clock work.  (<u>See</u> Complaint ¶¶ 17, 41-49.) | *(Same as above.)* |

**CIVIL MINUTES—GENERAL**

| | |
|---|---|
| Failure to pay all wages timely upon separation under California Labor Code sections 201, 202, and 203. (See Complaint ¶¶ 50-56.) | Failure to pay all wages timely upon separation under California Labor Code sections 201, 202, and 203. (See First Amended Complaint ¶¶ 106-116.) |
| Failure to provide accurate itemized wage statements under California Labor Code section 226. (See Complaint ¶¶ 57-64.) | Failure to provide accurate itemized wage statements under California Labor Code section 226. (See First Amended Complaint ¶¶ 99-106.) |
| Failure to reimburse for necessary business expenses under California Labor Code section 2802, based on both alleged work-related use of cell phones and alleged uniforms. (See Complaint ¶¶ 20, 65-69.) | Failure to reimburse for necessary business expenses under California Labor Code section 2802, based on both alleged work-related use of cell phones and alleged uniforms. (See First Amended Complaint ¶¶ 87-98.) |
| Unfair business practices under California Business and Professions Code section 17200 et seq. (See Complaint ¶¶ 70-84.) | Unfair competition under California Business and Professions Code section 17200 et seq. (See First Amended Complaint ¶¶ 117-134.) |

As the chart demonstrates, each one of Plaintiffs' six causes of action are asserted in Montgomery. Plaintiffs attempt to obfuscate this reality by arguing the wrong legal standard and citing inconsequential differences. Doubtless, the two actions are not "identical," as Plaintiffs show. (Stay Opposition at 2.) But no two cases *ever* are identical, and it is substantial similarity, not identicality, that matters. See Montgomery, 2019 WL 8168064, at *3 ("Where a stay is considered pending the resolution of another action, the court need not find that two cases possess identical issues; a finding that the issues are substantially similar is sufficient to support a stay.") (citing Landis, 299 U.S. at 254). Plaintiffs cite four differences between the two operative complaints, all of which establish that they do not bring claims that the Montgomery plaintiffs *do* bring, such as meal or rest period claims. (See Stay Opposition at 2-3.) But why should it matter if the Montgomery action is *broader* than this case, when Montgomery would still entirely subsume every claim Plaintiffs have chosen to bring here? Because every one of the six causes of action in the Complaint would be addressed in Montgomery, the Court could potentially resolve virtually every factual and legal issue raised here by allowing the earlier-filed action to be decided first—a significant savings to scarce judicial resources.

Likewise, the two putative classes are substantially similar:

| Proposed Class Definition in Instant Case | Proposed Class Definition in Montgomery |
|---|---|
| "The Class consists of Plaintiffs and all other persons who have been employed by [Target] in California as an hourly paid or non-exempt employee during the statute of limitations period applicable to the claims pleaded here." (Complaint ¶ 2.) | "Hourly Employee Class: All persons employed by [Target] in hourly or non-exempt positions in California during the Relevant Time Period," i.e., since June 6, 2015. (See First Amended Complaint ¶ 12.) |

The only difference between the two is that the <u>Montgomery</u> class is broader, extending back further in time.  Once again, that the putative class here is entirely swallowed by that in <u>Montgomery</u> favors a stay.  In sum, despite a few minor differences between the two actions, they are substantially similar.  Since <u>Montgomery</u> "is likely to resolve most of the legal and factual questions in this case, it would be inefficient to allow this case to proceed at this time. The filing of duplicative actions hinders the resolution of cases and unnecessarily taxes the Court's resources."  2019 WL 8168064, at *5.  The third factor strongly favors a stay.

Because the relevant factors all weigh in favor of a stay, the Court GRANTS the Motion to Stay and STAYS the instant action pending resolution of the overlapping claims in <u>Montgomery</u>.

## V.   CONCLUSION

For the reasons above, the Court **DENIES** the Motion to Remand and **GRANTS** the Motion to Stay.  The Court **STAYS** all further proceedings in this action pending resolution of the overlapping claims in <u>Montgomery</u>.  The parties are **ORDERED** to jointly file a report on August 28, 2023 and every sixty days thereafter describing any developments in <u>Montgomery</u> (or any other related action) pertinent to the stay.[5]  The July 17, 2023 hearing on the Motions is **VACATED**.

**IT IS SO ORDERED.**

---

[5] Resolution of a motion for class certification in <u>Montgomery</u> would be the most important such development.  While circumstances may change in the coming months, the Court's tentative position would be to lift the stay if (and likely only if) class certification is denied in <u>Montgomery</u>.